[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The plaintiff wife initiated this action for dissolution of her marriage of twenty-eight (28) years by writ, summons, and complaint returnable on February 29, 2000. The parties were married In Brooklyn, New York, on August 27, 1972. They are the parents of two (2) children, Allison and Jason, both now adults and in college. She is forty-eight (48) years old, in good health, resides in the marital home the parties jointly own at 82 Mariners Way in Fairfield, Connecticut, and is presently employed as a supervisor at Southwestern Connecticut Agency on Aging in Bridgeport, Connecticut, at a pre-taxed salary of $57,200. She received her B.S.N. in Nursing from Fairfield University in 1991; in January of 1998, she returned there to pursue study leading to an A.P.R.N. (Advanced Practice Registered Nurse) but completed only half the requirements of that program.
The defendant husband is forty-nine (49) years old with a 1975 degree in dentistry from Tufts Dental School and a 1995 juris doctor degree from Quinnipiac Law School. He has nor passed the Connecticut State Bar. He left the marital home in December of 1999 and it is believed he presently resides in Florida. He has a license to practice dentistry in New York and Massachusetts; his Connecticut license to practice dentistry was either suspended or revoked on or about March of 2000.
When the couple married, the plaintiff had just completed her third year at Brooklyn College and the defendant had just graduated from that school. He began dental school at Tufts one (1) week later and, for the three (3) years prior to his matriculation there, the plaintiff worked full-time in office management at another dental practice. Her parents paid the couple's rent, his parents provided them money from time to time, and his school costs were financed mostly by student loans which have now either been repaid or have been forgiven by virtue of his practicing dentistry in an under-served area in Boston. His residency was CT Page 2323 served at Mt. Sinai in New York, during which time the wife testified he was physically abusive to her.[1] Nevertheless, they returned together to Massachusetts upon completion of his residency. He worked for one (1) year as an associate in a surgical practice while she returned to school. He then started his own practice in Boston; she worked in his office twelve (12) hours a day, six (8) days a week setting up office systems and doing some bookkeeping and she continued to be so employed until just before giving birth to their first child Allison on April 5, 1978.
By the time their son Jason was born on October 4, 1980, the defendant had a staff of approximately five (5) in his Boston office on Dartmouth Street and he had also opened a satellite office in Brighton, Massachusetts.[2] By the summer of 1993, the couple had bought a new home in Newton, Massachusetts, and the plaintiff returned to work in the Dartmouth Street practice. By then, she was very much involved as well in the care of the couple's five (5) year old daughter who had been diagnosed with a Stage 4 tumor of the head and neck muscles; the child required surgery and chemotherapy treatments and her medical care was carefully attended by the plaintiff and the plaintiff's mother who had moved into the couple's home for that reason. Since the defendant was then also employed by a Connecticut company which held a patent for titanium dental implants and was required to spend four (4) days a week in Connecticut[3] and since Allison's oncologist had accepted a position at Yale, the couple moved here in June of 1985 and purchased the Fairfield property.[4]
Almost immediately following the move, the marital relationship deteriorated. The plaintiff testified the defendant became agitated and was unable to sleep or to function well either at home or at work. He sought the help of a psychiatrist who prescribed medication trials which seemed only to aggravate his symptoms. By the fall of 1985, he had become delusional and believed his daughter's illness was punishment for an affair the plaintiff testified her husband had had with a dental assistant in the Boston practice. Ultimately, the defendant attempted to take his own life and was admitted to the psychiatric unit at Norwalk Hospital for three (3) weeks. Fragile upon release, he resumed medication trials and, by the winter of 1986, he had sufficiently recovered to enable his return to the dental marketing job from which he earned seventy-five to one hundred thousand ($75,000-$100,000) a year.
Still depressed, however, he could not tolerate the demands of the job and he left that employment. From mid-1987 to 1992, he was employed in a dental practice in Manhattan as well as in a Fairfield practice. In 1990, he attended Montefiore for a post doctorate degree in CT Page 2324 prosthodontics but did not complete that program. In the spring of 1992, he and Paul Iaropoli, another dentist, bought a Fairfield practice called Center for Oral Rehabilitation.
As the years passed, the relationship between the two dentists deteriorated though there was evidence it had been a lucrative practice. The Center's 1995 1065 federal tax return showed gross sales of $813,307 (Plaintiff's exhibit F) and the plaintiff testified there was another year in which the practice grossed over a million dollars. Though the plaintiff stated she did not know the costs of payroll, overhead, supplies and/or equipment, leasehold improvements, maintenance, etc. and therefore could not testify with personal knowledge of the profitability of the practice, the defendant's 1995 1065 (K-1 Schedule) showed ordinary income to him of $99,712.[5]
In March of 1997, Iaropoli left the practice; he took half the staff and the business records with him. The plaintiff and the defendant doubled their efforts to resuscitate the practice at the same time the former partners sued each other. The defendant sued Iaropoli for breach of contract and Iaropoli's counter-suit claimed the defendant had embezzled funds from the practice. Iaropoli obtained a prejudgment remedy attaching the marital property in the amount of $371,095.45 and got a default judgment of over two million dollars against the defendant.[6]
There followed the commencement of a criminal investigation by the Internal Revenue Service, which investigation continues.
The defendant continued to practice dentistry in this state at least through October of 1999. Plaintiff's A established income to his practice for the period beginning January 4, 1999, and ending October 12, 1999, in the total amount of $340,701.06. No testimony was offered regarding the cost of doing business during that period, whether any of that amount was for services performed by Dr. Iaropoli or during that period of time when Iaropoli was entitled to 50% of the profits or, therefore, the extent of the profits realized. No tax returns applicable to that period were offered.
At some period of time, the defendant became actively involved in day trading. No evidence was offered regarding the extent of his gains or losses from that activity.[7] What is known is that, by the spring of 1999 (by which time had had completed his law degree but had failed to pass this state's bar), his conduct toward the plaintiff had become very aggressive, controlling, and verbally and emotionally abusive. She described such events as his throwing of a laptop computer, cutting a telephone line as she talked to her mother, following the plaintiff around, monitoring her computer entries and telephone calls, calling her CT Page 2325 names in front of the children, etc. She offered that her fear of him was such that she kept a bag packed in her car in the event she needed a quick exit from the marital home.
It is also so that the couple had for a number of years lived a life of affluence. Their large, ten room house (which the plaintiff valued at $600,000 to $700,000 on her financial affidavit of November 7, 2000) was fully and appropriately furnished; they took vacations to Israel, Paris, Bermuda, and Disney World, and they stayed at four star hotels; the children attended a private high school costing $13,000 a year and both now attend Brandeis University (at a present total cost of approximately $34,000 per year); all drove luxury cars (even now, she and the two children each drive a Lexus SUV); on the couple's 25th wedding anniversary, the defendant presented the plaintiff with a gold Jaguar convertible which he had leased for two (2) years and which he took away from her after one (1) year in the summer of 1999; she wore nice clothing and had some expensive jewelry; the family purchased all kinds of electronic gadgetry. She would ask him for $10,000 every four to six (4-6) weeks, he would give her the money, and she would place it — together with her own paychecks — in their joint checking account from which she would pay the bills. The last such disbursement of cash (In the amount of $10,000) was in the spring of 1999. In the fall of that year, he took from her the family checkbook and he has not returned to the marital premises since December of 1999. Subsequent to that, time, the plaintiff received a letter from Mid America Bank threatening foreclosure and she was required to liquidate part of a stock account in her name to pay the mortgage arrearage in the approximate amount of seven thousand dollars ($7,000.00).
Evidence was taken over two (2) court days. The plaintiff was present with her counsel and testified. The defendant was not physically present but was represented by counsel. The plaintiff offered numerous exhibits; most were documents from financial institutions or brokerage firms, many of which were one-two (1-2) years old. Included were February, 2000, statements of three (3) separate stock accounts at Morgan Stanley Dean Witter, copies of which had been mailed to the defendant at the marital property. Those accounts were in the name of the defendant's mother (Bernice Bonk) either individually or as "successor trustee for the benefit of" another (un-named) person or simply as "trustee for the benefit of" another (un-named) person.[8] While it is tempting to conclude — as the plaintiff urges — all of the monies in all three (3) of these accounts are being held by Mrs. Bonk for her son, the only evidence of any conduct by the defendant which supports a finding he was the true owner of these funds or that he exercised control over any one of these accounts is an IRA distribution request of October 22, CT Page 2326 1999, relative to account no. 5240102 held at Dean Witter Reynolds, Inc. (Plaintiff's N). A postit on that request form asks the defendant to sign as authorization so that S10,000, [$10,000], can be transferred from that account (in his name) to account no. 524-062059-318, an account in Bernice Bonk's name. The court therefore finds the Dean Witter Reynolds account is the defendant's and that he contributed the sum of $10,000 to account no. 524-062059-318, the Morgan Stanley Dean Witter account held by Bernice Bonk as successor trustee for the benefit of the defendant husband.
The parties jointly own five hundred (500) State of Israel bonds which mature February 1, 2009. The defendant additionally had funds in retirement accounts in his name[9] in 1999 though it is not certain they now exist or that those funds have not been transferred to other accounts, the identity of which are unknown. It is clear, however, the defendant intends to keep secret funds from his wife and children. He had set up custodial accounts for Allison and Jason under the Connecticut Uniform Transfer to Minors Act. With specific regard to three (3) such accounts held for Allison at People's Bank[10] and a request by the plaintiff he release those funds to their daughter, the plaintiff testified the defendant said he would do so only if the plaintiff provided him a copy of her deposition testimony in the Iaropoli case and if such testimony "meets my satisfaction." He had a certificate of deposit at People's Bank with a balance of $7,643.30 as of February 29, 2000; the maturity date of that CD has passed. Because his credit was bad, the plaintiff's credit was used to purchase a Mitsubishi Eclipse for him in 1997. The car was repossessed. Law suits have been brought against the plaintiff for bills he said he would pay but did not or for checks he gave businessmen, which checks bounced.[11]
The plaintiff requests she be awarded alimony based upon her husband's earning capacity. While a trial court may base financial awards on a party's earning capacity as opposed to actual earned income,[12] to the extent reasonably possible, such awards "should be based on the parties' current financial circumstances." Cuneo v. Cuneo, 12 Conn. App. 702, 709
(1987) ". . . [E]arning capacity is not an amount which a person can theoretically earn nor is it confined to actual income, but rather it is an amount which a person can realistically be expected to earn considering such things as his vocational skills, employability, age, and health." Lucy v. Lucy, 183 Conn. 230, 234 (1981). The plaintiff urges this court consider the defendant holds a law degree in this state, is believed still to be licensed to practice dentistry in New York and Massachusetts, and is an experienced day trader. Not only, however, is little known about his current income stream but it cannot be said he is presently employable as either a lawyer or dentist in any state including Florida where the wife has testified he lives with a female friend. Proof CT Page 2327 of what he earned in 1995 is not determinative of his present earning capacity. Assuming arguendo the defendant is able to practice dentistry again despite his checkered history[13] and that he can again attract patients and obtain malpractice insurance, no expert testimony was offered to establish the earning capacity of a dentist of his experience, skill, training, and unique personal history. Nor is it likely he will be admitted to the bar of any state while a judgment against him for embezzlement still stands.
Connecticut General Statute § 46b-82 provides:
 "[i]n determining whether alimony shall be awarded, and the duration and amount of the award . . . shall consider the length of the marriage, the causes of the . . . dissolution . . ., the age, health, station, occupation, amount and sources of income, vocational skill, employability, estate and needs of each of the parties. . . ."
Nothing is known of the defendant's present needs; yet, it is so that the precarious financial circumstances in which he has left his family is as a result of his voluntary conduct. At best, he exercised very poor judgment and/or knew little of fiscal responsibility or money management. At worst, he is dishonest and unconcerned of the extent to which his wife and children may suffer so long as his own needs are satisfied and his financial security is made safe. Whichever is true and despite the plaintiff's need to keep a roof over her own and her childrens' heads,[14]
the evidence here offered does not support a specific award of alimony.[15]
The plaintiff also asks an award of counsel fees — to include fees incurred for representation in suits other than this dissolution action — i.e., fees incurred in representing the plaintiff in matters instituted by Paul Iaropoli, the defendant's former dental partner, and in defending against other civil claims arising out of the defendant's fiscal practices. As stated, the defendant chose not to appear in this action and chose not to file a financial affidavit. While the failure of the defendant to file such affidavit does not preclude the court's exercise of discretion to award attorney fees, the order of one party to pay the other's legal fees should, under Connecticut General Statute § 46b-62, be "in accordance with their respective financial abilities and the criteria set forth in section 46b-82." The plaintiff's failure to sustain her burden to demonstrate the defendant has the present ability to pay the wife's legal fees together with the plaintiff's income of $57,200 yearly and her having already paid $15,000 in attorney CT Page 2328 fees precludes such an award. Concrete evidence the defendant has ample liquid funds to pay the plaintiff's attorney's fees is lacking. See e.g.Graham v. Graham, 25 Conn. App. 41, 50 (1991).
The cause of the breakdown of the marriage is the defendant's abandonment of the family in the late fall of 1999, a direct consequence of his financial mismanagement of family funds.
In fashioning orders, the court has considered all of the factors set forth in §§ 46b-81 and 46b-82 together with § 46b-62 as above referenced. The court has examined the exhibits, evaluated the plaintiff's credibility, considered the parties' claims for relief, and studied their memoranda of law in light of the applicable case law.
In addition to the foregoing, the court finds:
1. There is the requisite jurisdiction, the plaintiff having been a resident of this state for at least twelve (12) months next proceeding her institution of this dissolution action.
2. The allegations of the complaint have been proved and are true.
3. The marriage of the parties has broken down irretrievably as a result of the husband's misconduct and there is no hope of reconciliation.
The following orders shall enter:
1. A decree of dissolution enters on the grounds of irretrievable breakdown.
2. The plaintiff is returned to her maiden name of Helen Kutner.
3. Each party shall pay his/her own attorney fees.
4. The defendant shall pay to the plaintiff periodic alimony of $1.00 per year.
5. The plaintiff shall retain as her sole property all interest in her 403B, all sums in her bank accounts, her leased Lexus, and all jewelry in her possession — all to the exclusion of the defendant. CT Page 2329
6. The defendant shall repay to the plaintiff the sum of four thousand dollars ($4,000) in back taxes owed on the family automobiles.
7. The defendant shall be solely responsible for repayment of the loan to Hudson United Bank (account no. 20028062) and for monthly payments of four hundred fifty-four dollars ($454).
8. The husband shall be enjoined from withdrawing or transferring any funds in any custodial account established for the benefit of the parties' children, Allison and Jason, and he shall advise them in writing within ten (10) days of the date of this decision of the present location of each such account (the name of the financial institution and its address), the account number, the current balance of said account, and the person for whose benefit the account is held.
9. The plaintiff shall retain her one-half (1/2) interest in the marital premises at 82 Mariner's Way in Fairfield, Connecticut, as well as the entirety of whatever unencumbered interest the defendant may currently have in said property.
10. The plaintiff shall retain all of the contents of the marital home with the exception of the defendant's clothing which shall be shipped to him at his expense provided he advises the plaintiff of the address to which the clothing shall be shipped within thirty (30) days of this judgment. After thirty (30) days, the plaintiff may dispose of such clothing.
11. The plaintiff shall retain all interest in the Van Kempen funds in the Lindsco/Private Ledger Corp., account no. 90032875.
12. The plaintiff shall retain 100% interest in the State of Israel bonds now or formerly held at Chase Manhattan Bank, account no. 485599.
13. The plaintiff shall retain 100% interest in all that CT Page 2330 currently remains in what was the couple's joint savings account at Fleet National Bank (account no. 4445093083)
14. The plaintiff shall retain 100% interest in all that currently remains in what is now or formerly was the defendant's IRA at Gruntal Co., which account bears number 72A-565059.
15. The plaintiff shall retain 100% interest in all of what is now or formerly was the defendant's IRA account no. 5240102 held by Dean Witter Reynolds, Inc.
16. The plaintiff shall retain 100% interest in all of what is now or formerly was account no. 52406205918, which account is held by Morgan Stanley Dean Witter in the name of Bernice Bonk successor trustee FBO.
17. The defendant shall indemnify the plaintiff with regard to any and all liens as against his one-half (1/2) interest in the marital premises as a result of the prejudgment remedy attachment in the matter known as Bonk v. Iaropoli (docket number X05-CV97 0169003 S) and the foreclosure matter of Bonk v. Iaropoli (docket number CV00 037664 S)
SO ORDERED this 7th day of February, 2001.
SHEEDY, J.